## AFFIDAVIT OF SPECIAL AGENT PETER CAMPOPIANO IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Peter Campopiano, state:

### *INTRODUCTION AND AGENT BACKGROUND*

1.      I am a Special Agent ("SA") with the United States Capitol Police ("USCP"). I have been employed by the United States Capitol Police since 2009. I am currently assigned as a Special Agent in the Criminal Investigations Section where I investigate a multitude of violations of the law.

2.      I attended the Criminal Investigations Training Program in 2021 and Uniformed Police Training Program in 2009 at the Federal Law Enforcement Training Center in Brunswick, Georgia and Cheltenham, Maryland respectively for a combined period of nine months. I received extensive and formal on-the-job training in the provisions of Codes of the United States and District of Columbia. As such, I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code. My experience as an SA has include the investigations of cases involving the unlawful use and possession of firearms, acts of violence, public disturbance, damage or injury of property and the use of computers and the internet to commit offences.

3.      I am currently investigating Ryan Michael English ("SUBJECT") for Unlawful Receipt, Possession, and/or Transfer of a Firearm, in violation of Title 26 United States Code § 5861, and Carrying a Firearm, Dangerous Weapon, Explosive, or Incendiary Device on the Grounds of the Capitol, in violation of Title 40 United States Code § 5104 ("TARGET OFFENSES").

4.    This affidavit is being submitted in support of an application for a warrant to search a room in the residence of the SUBJECT at ████████████████████ South Deerfield, MA 01373 ("TARGET PREMISES"), as described in Attachment A, because there is probable cause to believe that it contains evidence, fruits, and instrumentalities of the crimes listed above, as described in Attachment B.  During a custodial interview with the SUBJECT on January 27, 2025, the SUBJECT stated that she left her phone and her Chromebook in her room at the PREMISES. Specifically, the SUBJECT stated that the phone is in her sock drawer with a note for her roommate that stated "Forgive me", and that her Chromebook is on her desk.  The SUBJECT also mentioned that a journal she kept is located in her room at the PREMISES.

5.    The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is probable cause for the requested search warrant and does not set forth all of my knowledge about this matter.

### PROBABLE CAUSE TO BELIEVE THAT A FEDERAL CRIME WAS COMMITTED

6.    The U.S. Capitol Police ("USCP"), along with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and the Federal Bureau of Investigation ("FBI"), are investigating potential violations of 26 U.S.C. § 5861 and 40 U.S.C. § 5104 that occurred in Washington, D.C. on January 27, 2025. Specifically, your affiant believes that the SUBJECT may have committed the TARGET OFFENSES on the U.S. Capitol grounds on January 27, 2025. Based on statements made by the SUBJECT during a custodial interview on January 27, 2025, there is probable cause to search the TARGET PREMISES described in Attachment A for the things described in Attachment B.

7.    During a custodial interview with law enforcement officers on January 27, 2025,

the SUBJECT admitted to planning a trip to Washington, D.C. about one month ago from

Massachusetts, where she resides. The SUBJECT bought an atlas with cash, to avoid any tracing

of the transaction. When the SUBJECT went to purchase the atlas, the SUBJECT also wore

clothes to conceal her appearance and left any cell phone at home to avoid surveillance. The

SUBJECT purchased the atlas to navigate to Washington, D.C., given that the SUBJECT knew

she would not bring a phone with GPS capability with her on her trip to Washington, D.C. A

photo of the atlas found in the SUBJECT's car is depicted below.



*A photo of an atlas recovered from ENGLISH's vehicle*

8.      As stated to law enforcement officers in the custodial interview, on January 27,

2025, the SUBJECT left Massachusetts, where the SUBJECT resides, to travel to Washington,

D.C. As planned, the SUBJECT purposefully left her mobile phone at the TARGET

PREMISES, her home in Massachusetts, so that the SUBJECT's travel and whereabouts could

not be surveilled. The SUBJECT then traveled to Washington, D.C. with the intention of killing

the "Nazi" Secretary of Defense, and/or the Speaker of the House, and/or burning down a think

tank based in Washington, D.C. that is located "two blocks from the White House." The

SUBJECT explained that these actions were specifically to "depose" these political offices and

send a message. On the evening of January 26, the SUBJECT stayed overnight at a rest stop

somewhere in New Jersey.

9.      On the SUBJECT's way to Washington, D.C., the SUBJECT stopped at a library in Chevy Chase, Maryland, observed Reddit posts mentioning the confirmation hearings of the Secretary of the Treasury and altered the SUBJECT's target.

10.     The SUBJECT also purchased alcohol bottles on the way to Washington, D.C. for the intended purpose of constructing a destructive device. Originally, the SUBJECT's thoughts were to use the small bottles of vodka to start fires. Later, the SUBJECT's plan was to wrap the bottles in rags soaked in alcohol, light the rags, and throw the devices at her target's feet.

11.     On Monday, January 27, 2025, at approximately 1:57 PM, the SUBJECT arrived on the U.S. Capitol Grounds. From 1:57 PM until approximately 3:12 PM, the SUBJECT walked loops around the grounds of the U.S. Capitol, scouting and surveilling the grounds. According to the SUBJECT's statements during the custodial interview, the SUBJECT surmised that the SUBJECT would have to kill, "at least," three U.S. Capitol Police Officers to get to the nominee and kill him. The SUBJECT recognized that these actions were likely to put the SUBJECT in grave danger and expressed acceptance and content with the possibility of suicide by cop.

12.     At approximately 3:12 PM, at 1 First Street NW, near the South Door of the U.S. Capitol Building, the SUBJECT approached a Capitol Police Officer (hereinafter "CPO-1") and stated "I'd like to turn myself in." The SUBJECT further admitted to being in possession of multiple knives and what the SUBJECT referred to as two "Molotov Cocktails".

13.     The SUBJECT was detained and searched by CPO-1 and another Capitol Police Officer (CPO-2). While being searched, the SUBJECT stated "I've got a knife in my pocket, and Molotovs in my jacket." The search of the SUBJECT uncovered a folding knife in the front right

4

pants' pocket, as well as two destructive devices from the inside pockets of a jacket. The destructive devices were constructed of 50 milliliter bottles of Absolut brand vodka with a grey cloth affixed to its top. A green BIC brand lighter was also recovered from the SUBJECT's pants' pocket.

14.    While being searched, the SUBJECT stated that the bottle contained "Vodka, hand sanitizer on the rag, and a lighter." When asked, "Is that really a Molotov cocktail?", the SUBJECT responded, "Well, it works." Shortly thereafter, the SUBJECT declared that she went to the Capitol that day to kill the nominee:

> Q.    What are you doing here today?
> A.    I was going to kill Scott Bessent.
> Q.    Kill Scott Bessent?
> A.    Yes, sir.

15.    ENGLISH's car was located in the 900 Block of Independence Ave SW. A law enforcement officer asked whether ENGLISH left anything on the ground when walking from the car to the U.S. Capitol. ENGLISH responded, "No. I don't want to hurt anyone . . . I don't want to hurt people. That's why I turned myself in." Law enforcement officers searched ENGLISH's car for additional destructive devices. The search uncovered a 750 milliliter bottle of Smirnoff 100 proof vodka and a grey sweatshirt with cloth cut from the sleeves. The cloth of this sweatshirt was consistent with the cloth affixed to the destructive devices. In the initial moments after her arrest, ENGLISH stated she left the larger bottle of vodka in her car because it "looked dumb in my jacket, so I got the smaller ones."

16.    During a search of the Defendant's person prior to transport, law enforcement officers recovered a receipt in the Defendant's back left pants' pocket. On the back of the receipt was written:



*A photo of a hand-written note found in ENGLISH's pocket*

17.     Additionally, as depicted below, the words "NO FUTURE NO CHOICE" were

hand-written on ENGLISH's arm.



*A photo of ENGLISH's arms*

18.     During the custodial interview on January 27, ENGLISH discussed what brought her to Washington, D.C.  ENGLISH told officers "pretty much the words on my arms say everything."  ENGLISH also informed officers that she had a congenital heart defect, and only had four months to live.  Regarding her intent and plans for traveling to Washington, D.C. that day, ENGLISH told officers:

- "I'd been thinking about this for a while, not this specifically I'd just been thinking about doing good and being good."

- "I didn't have a plan when I came down here. I've been wanting to devote my life... I've always wanted to live for other people... My life doesn't mean anything anymore the only thing I can do is help other people."

- "I didn't have a plan in my mind. I felt like I had to do this. I felt like I was on a mission . . . Maybe I told myself to have faith and just see where this goes and I had been thinking about for this for a while because of Luigi Mangione. I have seen the response to that and that situation . . . It was not an everyday thing and it extremely shook up everything. I pushed that away because I was thinking like that is so stupid, that accomplishes nothing, that poor kid just threw his life away for like a minute of vengeance. Vengeance is bullshit, no one feels good about that. I cannot see an average, ordinary person hurting someone else and feeling good about it and I know that's extremely naive, especially how he did it. It's some guy he never met before, he shot him in the back of the head- you can't feel proud about that. He's probably questioning his humanity every single day. But as time goes on and as time went on, I started to understand things differently in my own personal situation, not regarding Luigi, regarding mainly the foremost thing is time—the feeling of running out of time, but of holy shit it's me . . . I don't think I'm the Messiah or anything . . . It's fate, it's destiny, it's whatever you want to call it."

- "So when you ask me what my plans were today, I really did not have any. For a while I've been thinking about doing everything I can to live for others... I just want to help and to take care of my friends before myself. I don't have the money to flee the country... I have been talking to my friends very recently about 'hey I really believe it's time to get out of the country and everything'. The thought of violence didn't occur to me until fairly recently and the thought of 'Holy shit it's me, it's my role unfortunately' not that there is a role and then it's me it's that I have a role and unfortunately it's violence. That's very important, it's the other way around."

19.     As stated in the custodial interview, ENGLISH purchased an atlas about a month ago and started formulating a plan.  Once ENGLISH started driving to Washington, D.C.,

ENGLISH "was making all of these plans in my head of what I could do", including:

- "I was planning on burning down [a Washington, D.C.-based think tank], which is near the White House. I was planning on getting there, asking and pretending . . . I was going to go there under the guise of I applied for an internship . . . I was going to go to the [think tank], tell them what they wanted to hear, and basically say that I was, 'oh I was emailing with [Individual-1] for a while, oh it must have been a scam, oh that's so unfortunate' and introduce myself . . . I was just thinking of ways to meet [Individual-1], so I could kill [Individual-1] with . . . I was going to just slit [Individual-1's] throat because it was for revenge . . . I was going to go and do that, and if not that I was planning on burning down the building."

- "I was making all of these plans in my head of what I could do. If all else fails, I was going to slit my wrists on the White House steps. Just because that's all you can do if you can't hurt anyone else and you're out of options and you're out of time and you need to have an outlet and you need to show people how serious it is and you need to make one big dramatic fucking thing."

- "So, that's what I was going to do. I was gonna hurt big players. I really had such faith, that I was expecting to bump into someone who I would recognize and go for it. I was thinking, Trump's in LA right now for the fires, maybe I'll catch him on the way back, ram my car into him and just drive my knife into him and then just die in the process."

- "My thoughts and you know whatever, super incriminating stuff, SCOTUS, the Senate, running into Trump, and also like if all else were to fail, I could stake it out and just kind of like stay there like in the area and figure out what I wanted to do, whether it took days or weeks because I was kind of stuck there at that point."

## THE PREMISES CONTAINS EVIDENCE, FRUITS, AND INSTRUMENTALITIES

20.    I also have probable cause to believe that the premises to be searched contains fruits, evidence, and instrumentalities of violations of the federal statutes listed above, as described in Attachment B.

21.    During the custodial interview on January 27, 2025, the SUBJECT discussed her thoughts in the month leading up to the events of January 27, which included desires to kill numerous government officials and an employee at a Washington, D.C.-based think tank, "what I see happening with the executive orders," the "response" to Luigi Mangione, "chances to get a pistol or pistols" which she claims she didn't take, and reading articles about the then-nominee

for Secretary of the Treasury on Reddit. Based on your affiant's training and experience, and the

statements made by the SUBJECT during the custodial interview, your affiant believes that the

SUBJECT had been reading about these topics on the internet.

22.    Additionally, during the custodial interview, the SUBJECT stated that her phone

is in her sock drawer at the PREMISES, along with a note for her roommate that stated "Forgive

me." The SUBJECT also stated that her room at the premises contains her Chromebook, which

is on her desk, and a journal. Given that the SUBJECT had written both a physical note about

her actions and state of mind and had also written similar words related to her state of mind on

her arms, it is likely that her journal and the note she described leaving for her roommate include

similar evidence.

### SEIZURE OF COMPUTER EQUIPMENT AND DATA

23.    There is probable cause to believe that the SUBJECT'S cell phone or

Chromebook contains evidence of the TARGET OFFENSES.

> a.    From my training, experience, and information provided to me by other
>
> agents, I am aware that individuals frequently use computers to create and store
>
> records of their actions by communicating about them through e-mail, instant
>
> messages, and updates to online social-networking websites; drafting letters;
>
> keeping their calendars; arranging for travel; storing pictures; researching topics
>
> of interest; buying and selling items online; and accessing their bank, financial,
>
> investment, utility, and other accounts online.
>
> b.    Based on my training, experience, and information provided by other law
>
> enforcement officers, I know that many cell phones (which are included in

9

Attachment B's definition of "hardware") can now function essentially as small computers. The SUBJECT'S phone is such a type of phone. Phones have capabilities that include serving as a wireless telephone to make audio calls, digital camera, portable media player, GPS navigation device, sending and receiving text messages and emails, and storing a range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence of communications and evidence of communications and evidence that reveals or suggests who possessed or used the device.

c.      I am aware of a report from the United States Census Bureau that shows that in 2016, among all households nationally, 89 percent had a computer, which includes smartphones, and 81 percent had a broadband Internet subscription. Specifically, in 2016, when the use of smartphone ownership was measured separately for the first time, 76 percent of households had a smartphone and 58 percent of households had a tablet, and 77 percent of households had a desktop or laptop computer. Further, according to the Pew Research Center, as of 2019, 96 percent of adult Americans own a cellphone, and 81 percent own a cellphone with significant computing capability (a "smartphone"). The percentage of adults that own a smartphone is even higher among younger demographic groups: 96 percent of 18-29 year olds, 92 percent of 30-49 year olds, and 79 percent of 50-64 year olds owned smartphones in 2019.[1]

---

[1] https://www.census.gov/topics/population/computer-internet/library/publications.html; https://www.pewinternet.org/fact-sheet/mobile/.

d.      From my training, experience, and information provided to me by other agents, I am aware that the SUBJECT commonly stored records of the type described in Attachment B in computer hardware, computer software, smartphones, and storage media.

e.      Based on the statements made by the SUBJECT during the custodian interview on January 27, 2025, there is evidence indicating that SUBJECT used her phone and/or her Chromebook to access websites that influenced her plan that brought her to the U.S. Capitol on January 27, 2025;

f.      Based on the statements made by the SUBJECT during the custodial interview on January 27, 2025, the SUBJECT stated that her phone and her Chromebook were located at the PREMISES, along with a note to her roommate and her journal.

24.    Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

a.      Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

b.      Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a

11

computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how the computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

d.      Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

e.      Data on a storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers,

12

email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

f.      As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.

13

For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such

14

evidence in an effort to conceal it from law enforcement).

g.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

h.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

i.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

25.    Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy

15

and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage media ("computer equipment") be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized. This is true because of:

a.    The volume of evidence — storage media such as hard disks, flash drives, CDs, and DVDs can store the equivalent of thousands or, in some instances, millions of pages of information. Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names. Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity. This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

b.    Technical requirements — analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data. Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files. Many commercial computer software

16

programs also save data in unique formats that are not conducive to standard data searches. Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system as a "booby trap."

Consequently, law enforcement agents may either copy the data at the premises to be searched or seize the computer equipment for subsequent processing elsewhere.

26.    The premises may contain computer equipment whose use in the crime(s) or storage of the things described in this warrant is impractical to determine at the scene. Computer equipment and data can be disguised, mislabeled, or used without the owner's knowledge. In addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership at the premises during the execution of this warrant. If the things described in Attachment B are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize it onsite or off-site in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

27.    The law enforcement agents will endeavor to search and seize only the computer equipment which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachment B because that equipment fits the description provided by the SUBJECT. If however, the law enforcement agents cannot make a determination as to use or ownership regarding any particular device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

## CONCLUSION

28.    Based on the information described above, I have probable cause to believe that that ENGLISH has/have violated 26 U.S.C. § 5861 and 40 U.S.C. § 5104.

29.    Based on the information described above, I also have probable cause to believe that evidence, fruits, and instrumentalities of these crimes, as described in Attachment B, are contained within the premises described in Attachment A.

18

Sworn to under the pains and penalties of perjury,


Signed electronically with authorization from
U.S. Capital Police Special Agent Peter Campopiano on January 31, 2025.

/s/ Peter Campopiano
_____
Peter Campopiano
Special Agent, U.S. Capitol Police


Attested to by the applicant in accordance with
the requirements of Fed. R. Crim. P. 4.1 by

/s/ Katherine A. Robertson
_____
United States Magistrate Judge

on January 31, 2025


Signed electronically with authorization from
Katherine A. Robertson, U.S. Magistrate Judge on January 31, 2025.


1/31/2025